2011, 15, 61, 62, 2012, 10, 37. Mr. England. Thank you, Your Honor. May it please the Court. There are two separate obviousness type double patenting arguments that are made in our briefs. I want to start with the one based on the 775 patent. The 775 claims a chemical intermediate, and the focus of our argument is claim 7 of that patent, which claims a very specific compound. Your Honor, when a patent claims a chemical intermediate and it sets out, as it must, the use of that chemical intermediate to make a useful final compound, the final compound, in this case, Pemetrexin, is not a separate invention for obviousness type double patenting purposes. But the claimed compound is three chemical steps away, and a very complicated compound. What makes it obvious to make those three changes in the 775 intermediate to arrive at Pemetrexin? Well, Your Honor, the argument that we're making really comes from a combination of two lines of cases of this court. And both of them are critical. So the first line of cases is the Bikeson line of cases. But they all dealt with subject matter whose utility is set forth in a compound, whose utility is set forth, and then the subsequent patent is an attempt to claim that utility. They're quite different things. Well, Your Honor, I would respectfully disagree. And the reason I would disagree is the second line of cases. The second line of cases is In re Jolie, In re Kirk, and In re Fisher. And those cases, Your Honors, are familiar with. Those cases deal with chemical intermediates specifically, and what is the utility of a chemical intermediate? And those cases are very specific in saying that when you are claiming the utility of a chemical intermediate, it has to be specific. It has to be a specific final compound, and that specific final compound must have utility. Yes, that's the problem. There is a reference in the 775 specification to making Pemetrexin, but I don't find, and maybe you can show me where it is, any reference in that specification to the utility of Pemetrexin. It's there, Your Honor, because the very first line incorporates the 541 patent. Could you show me? Sure. So we're talking about 775 patent is at the appendix page 4365, and you're right, Your Honor, with the exception of this first line, the 775 would fail for lack of utility under the line of cases. I just identified, but the very first line under detailed description is the disclosures. What column are you in? I'm in column 1, line 17, under detailed description. What you're saying is that the column 1 refers to chemical intermediates useful in the preparation of compounds of formula 1, and just above that, it says that those are anti-neoplastic compounds. No, Your Honor, I'm not. That would be an inadequate disclosure under this court's case law for utility. It would fail the requirements of Fisher, Jolie, and Kirk. Simply saying, oh, generally they're useful as anti-neoplastic agents would fail section 101. Our cases say, or your cases, I'm sorry, say you have to have a specific utility. You have to say this intermediate can make this final compound which has this utility, and that, Your Honor, in answer to your question, is this disclosure of serial number 541 incorporated herein by reference. The 541 was the Pemetrexid application. So that was the application that led to the 932. And I understand... I'm sorry, what page is this again? I'm sorry, that was... I just left it. That is, in the 775 patent, which is page 4365 of the appendix, column 1, lines, it looks like 17 and 18. Which patent is that? That's the 775. 775. And the 541 application is the application that led to the 932? Exactly. And in that, Your Honor, there is a description of the utility of Pemetrexid and the specific findings with respect to its anti-neoplastic utility. So that's the only thing that... Well, Your Honor, I guess we... I understand the point, but without that disclosure, the 775 patent itself would have failed. Well, maybe so, but the question is whether, under our cases, which suggest that if you have a disclosed utility that you elect not to claim, that you may run into a double-patenting problem. But here, the disclosed utility is in the very application of the patent that's being argued should be subjected to a double-patenting objection. It doesn't strike me as clear on its faith that that should fall within that. I understand both of Your Honor's questions, and I guess I would preface my remarks by saying I think chemical intermediates are an unusual, obvious, and tight double-patenting application. But it is, I think, unavoidable if you take your Bikeson line of cases, which say if you claim a compound, do that, you then can't claim its utility separately. Because the words of Bikeson, it is an essential part of one invention, the compound and its utility. That's a very different case. That's not dealing with chemical compounds, which are different from each other in several respects. Those are two patents which essentially claim the same insulated coil. Your Honor, I don't think respectfully that it is a different case. I think the principles of BIKE are exactly what we have here. Because if you take Fisher and Jolie and Kirk, they are saying when you claim a chemical intermediate, this is how you must claim the utility. And then BIKE says if you claim a compound, the utility is an essential part of that. And the basic principles of obvious and tight double-patenting are present here. Because what you have is you have a claim to the chemical intermediate. Now, accepting Judge Rich's concurrence in Zickendrott, he says, look, upon the expiration of that 775 claim to the chemical intermediate, the public should be free to use that, what was claimed, for its disclosed use. The only disclosed use of Claim 7 compound, the only disclosed use of it was to make Pemetrexid. But because you have the second patent, because you have the 932 behind it, you could not use it for its disclosed use. It literally violates exactly what Judge Rich says is the principle of obvious and tight double-patenting. You have an extension of the claim of the 775. But you could use it. You could use it. You could find any other use. Except for the one utility that was necessary to get it patented and that was disclosed in patent. You couldn't do that, Your Honor. And that, I think, is another way of looking at it, which may be useful to the court. You have a claim to the 775 patent, which is a compound. Perhaps we can all agree, and maybe Judge Lurie would disagree, that if the claim in the second patent was a claim to Pemetrexid made by use of the chemical intermediate compound 7, that would be exactly bike. You would then have a claim to using the chemical intermediate to make Pemetrexid. That would be exactly bike. But what that claim is, the one I just defined, is a species of the genus of a claim to Pemetrexid. Rather than hypothetically, why don't you get to your other point, which is the thiamine compound. Okay. Your Honor, I will move to the 608. Unless either of Your Honors has further questions on this? No. Okay. I would say one other thing about this, which is the arguments being made by the other side with respect to the 775 claim are not quarreling with the law as I'm setting it out. They're asking you to limit Sun to its facts, which has already been tried and failed. And they're saying to you that you're not allowed to look at the specification. And that argument, I think, Your Honors, is plainly wrong in the context of the bike Sun line of cases. There are over half a dozen cases in this court. It sounds like you don't want to answer the question about the thiamine compound. No, I do, Your Honor. I'm happy to move this claim. I just wanted to make sure I covered my point. On the 608, this is a more traditional type of obviousness type double patenting argument. And again, on the undisputed facts, there's obviousness type double patenting here. Obviousness type double patenting asks that you look at the differences between claims. The only difference between the compounds at issue is that a phenyl has been placed instead of a thionyl in what's called the aero position. But wouldn't a phenyl compound obvious in view of, we're calling it a phenyl compound, but phenyl is only one portion of a very complicated compound. Agreed, Your Honor. Just as a thionyl moiety is only one part of a very complicated compound. What makes the second compound obvious over the first? Well, the answer to that is, I think you've defined the question exactly as it is in your case law. Are there two inventions here? In other words, is the difference inventive? Their argument has to be that placing a phenyl in the aero position of an anti-folate is inventive. Your Honor, as of December of 1988, every known anti-folate with activity data had a phenyl in the aero position. In other words, their argument to you is, it was inventive literally to do the prior art and the only thing that was known in the prior art. Didn't they inhibit different enzymes? No. By knowing the phenyl? No, Your Honor. In fact, maybe the best way to explain this is, if you go to page 53 of the opening brief, we lay out there six different compounds. These were six known compounds at the time. Two of them, aminoptum and methotrexate, had actually been used as drugs. Methotrexate still is. Each of these six compounds has a phenyl in the aero position. If you go through those compounds, Your Honor, several of these inhibited DHFR, but I believe it's IHQ inhibited TS. And DDA-THF inhibited what's called Garftin and Icarft. So you had a series of known compounds. These are a selection of phenyl compounds after the fact, right? No, Your Honor. You should be thinking of what was the total state of the art at the time the invention was made. This is the evidence as of the time that the invention was made. Two had been used as drugs. Three had gone to the clinic. And one other was designated by our experts as promising and there might have been a quarrel over that. Those are the six that are shown here. They all had a phenyl. There were none that didn't have a phenyl. There were no known antifolates after December of 1988 that didn't have a phenyl as to which there was known activity data. This was the prior art. Not only was the prior art to have a phenyl, every one of these had the 2-amino as well, which what was sold to the district court was that the prior art had somehow taught away from a combination of a 2-amino and a phenyl. They all had a 2-amino and a phenyl. The prior art was to put a phenyl there. It was not inventive to do what… And this is a very unusual case because usually when you get these kinds of cases, there were a couple of pieces of prior art that suggested doing it one way and there were several other pieces of prior art that suggested doing it… I'm sorry. There may be a couple of pieces of prior art that suggested doing it the way that the defense, the party claiming invalidity says. That's not the case here. All of the prior art showed a phenyl. There was one particular compound, and your court cases say don't look at just one piece of prior art, called CB3717, which is on this list, which started with a phenyl and a 2-amino and had an issue with toxicity. Toxicity was traced to a lack of solubility associated with the 2-amino. That evidence was peculiar to that compound alone. It was not shown as to any of the other compounds that were known antifolates at the time. You're into your rebuttal time. You're not going to do it. We'll give you your two minutes back. Thank you. Mr. Perlman. What about this thionyl versus phenyl? Mr. Englander says all the known antifolic acid compounds were phenyl compounds. Good morning, Your Honor. We know about the isosteric relationship between thionyls and phenyls. So what's your answer to that? My answer, may it please the court, is what Mr. Englander has done is plucked out six compounds that they've unilaterally turned promising. We don't need to get into the party's quibble about that. But over the preceding four decades, thousands of antifolates had been made, and basically every single one of them had phenyl. Every single one of them was an abject failure, and no one ever turned them promising. It's not as if phenyl was particularly associated with success in this highly unpredictable art. We had 40 years of failure using phenyl, and Mr. Englander has picked out a handful that he thinks work a little better than the other failures. What's clear in this case, though, is the thionyl compound obviously departs from that, and there was no teaching, no reason whatsoever to believe that phenyl would be better than thionyl. And so there was no reason, as this court's obvious mistyped over patenting jurisprudence inquires, to make that change. There were affirmative reasons not to. There were affirmative reasons to make changes to other parts of the molecule. And as to isosterism, which Your Honor raised, that is a factual issue that they litigated at trial. Isosterism, basically reduced down to its essence, says if you make an isosteric change, you'll have binding to the same enzyme, but doesn't tell you whether it'll make the compound better, make it worse, and you might get the opposite activity. In fact, a reference relied upon by their own expert says the oversimplification of bio-isosterism is of little use in drug design. The district court did not clearly err in finding that it was of little use here. And so I think that on the 6-O-E compound, it really boils down to the fact that it is true. Phenyl had been used previously and ubiquitously and virtually always in failure, and there was no reason, having departed from phenyl, to go back. What about the intermediate? The cases upon which the defendants rely, the Dick or Bike, I'm not certain, and Geneva and Sun line of cases, deal with a particular situation where you claim a compound, disclose utilities for that particular compound, and then try to claim the same compound again, used for one of those disclosed utilities. Okay, so why should that situation be different from a situation? I want to give you a hypothetical because I don't think that's perhaps the situation here. A hypothetical that the 7-7-5 had said, you can use this intermediate to make permatryxin, and permatryxin is useful in anti-cancer as an anti-cancer agent. And the disclosed utility was not dependent upon the application for the 9-32, the 5-40-1 application. Why would that situation, that hypothetical situation, be different from the Sun line of cases? Why should that be any different? Because in the Sun line of cases, what you have is because the same compound is claimed as a limitation in both claims, the issue that the court was addressing was, it seems like two claims do essentially the same invention. The compound itself, and then that compound used again for its previously disclosed utility. In this situation, we have claimed two different compounds, and the record here establishes… Why should that make a difference? Because they are two different compounds. The concept of those cases is that it's unfair to have a patent on a compound and then to disclose another use and to claim that as a separate patent that's not subject to the term limitation. And I don't understand why should that situation be different from the situation here where the intermediate is used to make Permatrexid and Permatrexid hypothetically is described as an anti-cancer agent, but there's a decision not to claim it in the 775 patent. And I think the distinction that's critical here is that if we step back and ask, what's really the point of the double patenting doctrine in the first place? It's to prevent two claims to essentially the same thing. Here we have Permatrexid, which the district court held was not an obvious variant of the intermediate, which is not being challenged on appeal. And different than the situation in Geneva and in Sun and that line of cases, where the same compound is claimed in both claims. And so you have a concern that what we really have is two different claims in different forms of the same invention. Here we have one claim to an intermediate, which the evidence shows is useful to make thousands of final antifolates. And the separate claim is not to that intermediate again or using that intermediate, but to a final compound that is useful to treat cancer and to treat mesothelioma, which the evidence established can be made numerous ways without using that intermediate. And so the potential for difficulty that Geneva and Sun identified, that what you have is a claim to a compound, you had to disclose utility to get that claim, and you're just claiming the same thing again in a different form, doesn't apply to this situation. Well, suppose we reject that and say that it should. Does it make a difference here that the disclosed utility is dependent upon the 541 application, which itself is the very application for this 932 patent? I think it does highlight that what the defendants are trying to do here is contrary to the general principle underlying double patenting, that it is the claims of the two patents and the inventions that they define that are relevant and not the inventor's disclosure of his own invention that should be relevant. So it's not a situation in which something is disclosed but is not the subject of a patent application, which just happens to be the subject of a separate patent application. That's correct. But what I would say, Your Honor, is that in many double patenting cases, the specification of the two patents will be identical because they are in the same family. They're not identical here, right? Well, they're not identical here. That's correct. But they're from the same family, aren't they? They are. They're descended from the same ultimate grandparent. I think this is a critical point where the parties are departing on thinking about this, and I think the general foods opinion that Judge Rich wrote for this court is critical on this point. If the earlier patents in a double patenting analysis were prior arts, you would read it to understand what it suggested to the person of ordinary skill, what it disclosed to the person of ordinary skill, what it taught to the person of ordinary skill. In double patenting, you treat both the claims and the specification of the earlier patents very differently. The question is, what invention do the claims define? Irrespective of what information they contain, which if it were prior art, could be used as a teaching. Here, the invention that the earlier patent defines is a chemical intermediate that is useful for making many, many compounds. That is a patentably distinct invention from the invention defined by the claim of the 932 patent, which is Chepamotrexib itself. And what the defendants are seeking to do here, I would submit, is take a line of cases that was designed to address a particular narrow circumstance where the potential for undetected abuse was apparent because of the claim to the compound and then the claim to using the same compound again. So why wouldn't there be a potential for abuse if here, in fact, there hadn't been a separate 542 application and the patent application for the intermediate and said, well, you can make Permatrexib out of this and it's useful, and then years later, file another application, get a longer patent term on something that was disclosed and perhaps should have been claimed originally? Because the mere extension of some monopoly or the mere fact that the same act would infringe two claims is not double patenting. And Judge Rich himself said that in the Bratt case, which is after the Zickendrap concurrence that we heard about. And that's clear. The fact that the same act could infringe two claims doesn't make it double patenting. The question for double patenting is, if there is such an extension, is it justified or not? So why isn't it equally unfair in my hypothetical to describe Permatrexib and its anti-cancer properties without claiming it and then to file a later application for that when it's already been disclosed? Because the inventions defined by the two claims are patently distinct inventions. Permatrexib is not an obvious variant. Well, that's true, isn't it, in the Sun line of cases, too, that they're patently distinct. The Sun line of cases announced… Which sounds to me as though you don't like very much, right? I accept the Sun line of cases as the law of this court. But the Sun line of cases was addressed to a narrow circumstance where you had the same compound claimed in both claims. Isn't it also true if one files a patent application claiming a compound and its method of use, the patent office will sometimes require the applicant to restrict to one type of claim and the other one will issue a separate patent. And so this so-called unfairness in those circumstances is built right into the law. Well, I think it's correct that that does happen. And I think the question for… So unfairness isn't built into the law of double patenting. It's a question… In fact, I'm looking at the MPEP, which says an intermediate and a final product can be shown to be distinct as long as they're not overlapping in scope. Correct. Overlapping in scope and they're not obvious variants, and the intermediate makes more than the final. And that's correct. And the point I intended to make earlier, and perhaps not as eloquently as I should have, is that double patenting doesn't ask the question, well, does your later invention relate in some way to your earlier invention and prevent some kind of practice of your earlier invention? That really just poses the question. The question for double patenting is, is that justified? And if the inventions are patently distinct, as they are here, then it is justified. And the fact that we disclose that the intermediate is useful to make Pemetrexid outside of the Geneva and Sun line of cases, which are on very different facts, that is not relevant to the double patenting analysis because we look to the invention defined by the claim. If I could make one point on Mr. Englander's point about the Jolly and the Kirk and Fisher line of cases, I'd submit Mr. Englander is over-reading those cases. Those cases are about what do you have to disclose about what the intermediate makes in order to claim the intermediate. Those cases say nothing about whether you can also get a claim to the final compound disclosed. They were simply following in the line of credit of the invention. That's correct. Absolutely correct. And it is true. To claim an intermediate, you have to disclose the final compound that the intermediate is useful to make and what those do. I quibble with Mr. Englander about whether the generic disclosure is sufficient, and I think it is, but I don't think it matters to this case. Those cases have nothing to do with whether the final compound that the intermediate makes is patentably distinct from the intermediate compound. And this court's jurisprudence tells us the test to determine that, and that is, is the final compound an obvious variant of the intermediate? Here, it is not. So Geneva and Sun and that line do not apply. Are there other ways to make the final compound? Here, the undisputed evidence is there are numerous ways to make the final compound that would have been available to the skilled person at the relevant date that do not involve using this intermediate. Are there other compounds that can be made from the intermediate? Absolutely. The record for the district court was that there are thousands of final antifolates, including hundreds within Formula 1 of the 775 patent, that can be made with this intermediate. And the combination of those two facts, I submit, make this very different from Sun and underscore that these are patentably distinct inventions from one another. How about BIC? BIC is different but similar to Geneva. In BIC, rather than the second claim being a method claim, BIC was simply in composition form. You had a claim to a particular compound that was disclosed to be useful as an insulator, and then a claim to an insulated coil using that same compound. I think it is the same principle, and this court in Geneva treated BIC as if the later claim were to a method of using the previously disclosed compound. And the point that comes out of BIC and out of Geneva and out of Sun is that what you cannot do, which we are not doing, is claim a compound, disclose utilities for it, and then turn around and claim the same compound again for one of those disclosed utilities. That's very different from this case. Let me just sum up. The district court correctly held that Pemetrexid would not have been an obvious variant of either the 775 compound or the thionyl compound in the 608 patent. The Geneva, Sun, BIC line of cases do not apply to the 775 patent. Pemetrexid is patently distinct from each of those previous compounds, and the district court's judgment should be affirmed. Thank you, Mr. Proctor. Mr. Englander has two minutes. Thank you, Your Honor. Two minutes and nine seconds, Your Honor. I can do my best. Two things. Judge Dyke, there was a common application here for both the 775 and for Pemetrexid. It was the 742. There's a grandfather. And so I think that that's the usual situation where you have obviousness-type level patenting. You're going to have a disclosure for each of the claimed inventions in that common app, and that's exactly the situation here. So when I cited you the 541 and you asked me, is this an unusual situation, it's not, because both the intermediates, including the 775 and Pemetrexid, were disclosed in the common application going back. It's the 742. Very common situation for obviousness-type level patents. Secondly, Judge Lurie, your question about the MPEP. I read that definition and I determined that it's not helpful at all because it places the rabbit in the hat. It asks the question, are they not obvious variants? And here we would say they are obvious variants. Third, I started this before, and I think the best way to think of the 775 is that the claim to a chemical intermediate is essentially a species claim to the final compound because it is a claim, if you accept BIC, it is a claim that says it's a claim to a compound for use to make a particular compound. At least in the case of Claim 7, that's correct. The only utility that was necessary was to make Pemetrexid. The only disclosed utility. So you have a claim to a species of Pemetrexid. That reads directly on the later genus claim and invalidates it. And there's a series of cases that say that from this court. Vogel says that, Christensen says that, they all say that. It was in the record, not surprisingly, that the intermediate can be used for all sorts of compounds. It is correct. It is in the record that the intermediate could be used to make other than Pemetrexid. And a compound as complex as Pemetrexid can be put together in a variety of ways. That's correct. There was such evidence, Your Honor. I don't think that that is relevant to the question of the application of BIC under these circumstances. I think this is a logical, it is an unavoidable application of BIC plus Fisher. One more, if I may. On the other issue, the 608, my brother conceives as he stands up all of the prior art had a phenyl. And then he says virtually all of it had ended in failure. Well, if that were the case, nobody would have been working in the area. But instead you had, at the time in December, you had two different compounds in the clinic that still had phenyls and weren't just erected at TS. And he says, well, there's no evidence that it would have been better. That's not the standard. The standard is there's a reasonable expectation there would be activity. It was not invented under that prior art to put a phenyl in the aero position of an antifolate because that was the prior art. That was the prior art. And it's conceded everything had a phenyl. It was not invented to put a phenyl there. I think we have your position, Mr. Arnado. Thank you. Thank you both. We'll take the case under advisory.